Acosta, J. (dissenting).
If this case had come before us on appeal from a jury determination in defendant’s favor, I would have no hesitation in concluding that the verdict was supported by sufficient evidence. But on a motion for summary judgment all reasonable inferences must be drawn in favor of the non-moving party. In the context of an action brought pursuant to the New York City Human Rights Law, Administrative Code of the City of New York § 8-101 et seq. (City HRL), the court is required to recognize that discrimination is not only prohibited from being the entire reason for adverse action, but also prohibited from being any part of the reason for adverse action (see Administrative Code of City of NY § 8-107). Here, the motion court resolved factual issues in favor of the moving party. These issues include whether defendant engaged in retaliation against plaintiff for his protesting its alleged age discrimination against him. I therefore respectfully dissent from the majority’s decision to affirm the grant of summary judgment.
Evidentiary Framework
The core difference between the majority and myself in this case does not concern the validity of the framework that this Court established in Bennett v Health Mgt. Sys., Inc. (92 AD3d 29 [2011], lv denied 18 NY3d 811 [2012]). Rather, our disagreement concerns how much of an inference we are willing to draw in favor of the plaintiff in what I admit is a close case.
As this Court made clear in Bennett,
“[T]he identification of the framework for evaluating the sufficiency of evidence in discrimination cases does not in any way constitute an exception to the section 8-130 rule that all aspects of the City HRL must be interpreted so as to accomplish the uniquely broad and remedial purposes of the law” (92 AD3d at 34-35).
The Local Civil Rights Restoration Act of 2005 (Local Law No. *133 85 [2005] of City of NY) contemplated that the courts would elaborate an evidentiary framework that would best achieve the uniquely broad remedial purposes of the City HRL. Thus, this Court instructed:
“Where a defendant has put forward evidence of one or more nondiscriminatory motivations for its actions ... a court should ordinarily avoid the unnecessary and sometimes confusing effort of going back to the question of whether a prima facie case has been made out. Instead, it should turn to the question of whether the defendant has sufficiently met its burden, as the moving party, of showing that, based on the evidence before the court and drawing all reasonable inferences in plaintiffs favor, no jury could find defendant liable under any of the evidentiary routes — McDonnell Douglas, mixed motive, ‘direct’ evidence, or some combination thereof’ (Bennett, 92 AD3d at 45 [emphasis added]).[1]
Age Discrimination
I agree with the majority that defendant met its burden of putting forward evidence of one or more nondiscriminatory motives for its actions. I am concerned, however, that the majority has performed quintessential jury functions by resolving *134 whether plaintiff ultimately succeeded in proving discrimination through the McDonnell Douglas route as modified by Bennett or the mixed-motive route.
By enacting the City HRL, the New York City Council made it illegal to discriminate against an employee “in compensation or in terms, conditions or privileges of employment” (Administrative Code § 8-107 [1] [a]). Notwithstanding the majority’s undue emphasis on the compensation aspect of plaintiffs age discrimination claim, the City HRL, by its own terms, was enacted to protect more than just dollars and cents.[2] Indeed, in his complaint, plaintiff also alleges that he “has been humiliated, demeaned, and degraded.” He alleges that Dr. Spencer Foreman, former president and chief executive officer of Montefiore, inter alia, “[e]xaggerat[ed] and distort[ed] events involving [plaintiff], with respect to certain administrative issues in an effort to create and support arguments that Montefiore could then use to strike out at [plaintiff],” and that Foreman “[flailed to provide [plaintiff] with the same benefits made available to Montefiore’s department heads.”
If, as plaintiff also alleges, his claimed failures of performance were “stale” by the time of the adverse actions in question, he is not simply questioning defendant’s “business judgment.” On the contrary, an argument of this nature raises an important question as to defendant’s credibility: Would the institution or hospital be taking current action against an employee because of “old business”? A jury, after weighing all the evidence, might or might not conclude that defendant was doing exactly that. Thus, resolving the question is not the function of a court on a motion for summary judgment.
In that vein, “[a]n employer’s invocation of the business judgment rule does not insulate its decisions from all scrutiny in a discrimination case” (Weiss v JPMorgan Chase & Co., 332 Fed Appx 659, 663 [2d Cir 2009]). After all, “facts may exist from which a reasonable jury could conclude that the employer’s ‘business decision’ was so lacking in merit as to call into question its genuineness” (Dister v Continental Group, Inc., 859 F2d *135 1108, 1116 [2d Cir 1988]). Thus, contrary to the majority, I would not allow defendant to shield its potentially discriminatory actions from judicial scrutiny by merely uttering the words “business judgment.”
While the Court of Appeals’ construction of the City HRL in Forrest v Jewish Guild for the Blind (3 NY3d 295 [2004]) was rejected by the City Council when it enacted the Restoration Act,[3] the majority nonetheless quotes Forrest’s statement that “it matters not whether the [employer’s] stated reason for [the challenged action] was a good reason, a bad reason, or a petty one. What matters is that the [employer’s] stated reason for [the action] was nondiscriminatory” (3 NY3d at 308 n 5). That proposition is dubious since the mere existence of “[a] legitimate reason for [a challenged action] ... is not always mutually exclusive of a discriminatory or retaliatory motive and thus does not preclude the possibility that a discriminatory or retaliatory motive played a role in [the challenged] decision” (Gossett v Tractor Supply Co., Inc., 320 SW3d 777, 782 [2010]). Indeed, in construing the City HRL, this Court has consistently required that a defendant employer offer a nondiscriminatory reason (and evidence to support its proffered explanation) that specifically addresses and disproves the plaintiffs allegations (see e.g. Carryl v MacKay Shields, LLC, 93 AD3d 589 [2012] [“Defendant . . . explained that, though (plaintiff and his coworker) shared the same title and primary responsibilities, plaintiff and his Caucasian ‘peer’ were not similarly situated”]; Bennett, 92 AD3d at 46). Here, defendant has failed to meet that burden.
As the majority acknowledges, the evidence, viewed in the light most favorable to plaintiff, shows that “seven older physicians left Montefiore involuntarily” (emphasis added). While this evidence is not in itself dispositive of the existence of age discrimination, it is certainly much more than a “collateral matter[ ]” that the majority does not wish to bother justifying. If an employer is treating employees less well because of their age, that same employer may well be paying older employees who refuse to leave less than they would he paid in the absence of age discrimination (see e.g. Murphy v American Home Prods. Corp., 159 AD2d 46, 49-50 [1990] [evidence indicating employer’s discriminatory treatment of employees other than plaintiff relevant “since such evidence is highly probative of the employer’s actual state of mind”]).
*136 The majority maintains that
“the statistical evidence in the record concerning the compensation of other departmental chairmen tends to refute any inference that age was a factor in setting their compensation. The record shows that some chairmen older than plaintiff or around the same age were paid more than he was, while some younger chairmen were paid less.”
It is beyond cavil, however, that an employer need not engage in a consistent pattern of discrimination in order to discriminate against a particular individual on account of his or her protected status (see Brown v Henderson, 257 F3d 246, 253 [2d Cir 2001] [“whether an employer discriminates against only a subset of a protected class, or discriminates inconsistently, Title VII nevertheless protects any individual so long as that individual is mistreated because of (his protected status)”] [citation omitted]; Hodges v Rensselaer Hartfor Graduate Ctr., Inc., 2008 WL 793594, *6, 2008 US Dist LEXIS 22228, *18 [D Conn 2008] [“The failure of a decision-maker to discriminate against other members of the protected class does not give rise to an inference that the decision-maker did not discriminate against Plaintiff’]; see also Holcomb v Iona Coll., 521 F3d 130, 140 [2d Cir 2008] [the fact that the employer did not terminate another employee who was also in an interracial marriage “does not allay the suspicion that the firings were grounded in an illegitimate motive”]). Not all individuals manifest the particular traits that lead others to discriminate against them on the basis of their membership in a protected group (see e.g. Charles A. Lofgren, The Plessy Case: A Legal-Historical Interpretation, at 41 [Oxford University Press 1987] [“Plessy’s (arrest) was surely arranged, because despite the allegation in the arresting officer’s affidavit that Plessy was ‘a passenger of the colored race,’ he . . . was only one-eighth black and, as his counsel later asserted, ‘the mixture of colored blood (was) not discernible’ ”]). Similarly, not all employers have an unfettered ability to act on their biases.[4] Thus, what matters in an employment discrimination suit is whether a particular individual has been the victim of illegal discrimination (cf. Brown, 257 F3d at 253-254 [“what matters in the end is not how the employer treated other employees, if any, of a different (protected status), but how the employer would have treated the plaintiff had she been of a different (protected status)”]). Defendant Montefiore “may not *137 escape liability for discriminating against a given employee on the basis of [his or her protected status] simply because it can prove it treated other members of the employee’s group favorably” (Graham v Long Is. R.R., 230 F3d 34, 43 [2d Cir 2000]). Nor does it matter that some of the younger chairmen were paid less than plaintiff (cf. Brown, 257 F3d at 253; Pitre v Western Elec. Co., Inc., 843 F2d 1262, 1272 [10th Cir 1988] [“an employer is not immunized from liability simply because some males received detriments before or contemporaneously with a Title VII plaintiff’]).
“[E]mployment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence. An employer who discriminates is unlikely to leave a ‘smoking gun,’ such as a notation in an employee’s personnel file, attesting to a discriminatory intent” (Rosen v Thornburgh, 928 F2d 528, 533 [2d Cir 1991]). Thus, what is not explained is often as important as what is explained. Here, plaintiff identified and defendant conceded that there was a series of employees in their 60s and 70s who ended their employment at defendant’s urging and were replaced by younger employees. For example, the 65-year-old chairman of orthopedics was, in the words of defendant, “encouraged” to leave, the director of infectious disease and the chairman of gastroenterology, both in their 60s, were “asked to leave,” and the director of pediatric endocrinology, in his late 60s, was “pushed out.”[5] Despite admitting that a series of older employees left involuntarily and were replaced by younger employees, defendant did not show that all the firings were prompted by nondiscriminatory motives.[6] De *138 fendant, as the proponent of summary judgment, bears the burden of showing that, based on the evidence before the court and drawing all reasonable inferences in plaintiffs favor, no jury could find defendant liable under any of the evidentiary routes (DeNigris v New York City Health & Hosps. Corp., 2012 WL 955382, *7 n 5, 2012 US Dist LEXIS 39321, *21 n 5 [SD NY 2012], quoting Bennett, 92 AD3d at 41). Defendant’s perfunctory and unsubstantiated claim that replacing older individuals with younger individuals somehow constitutes a “natural occurrence” is insufficient to defeat the inference that this Court must draw in favor of the plaintiff.[7] Viewed in the light most favorable to plaintiff, the evidence could suggest that complaints about plaintiff’s performance were not the only factors that motivated the complained-of behavior. Accordingly, it is relevant to the McDonnell Douglas analysis.
In a close case, this Court should not substitute its judgment for that of a jury (cf. Albunio v City of New York, 16 NY3d 472 [2011] [upholding a jury verdict for a plaintiff in a case that is a “closer” call]; Vivenzio v City of Syracuse, 611 F3d 98, 106 [2d Cir 2010] [“It is not the province of the court itself to decide what inferences should be drawn . . . ; if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper”] [internal quotation marks omitted]; Carlton v Mystic Transp., Inc., 202 F3d 129, 134 [2d Cir 2000], *139 cert denied 530 US 1261 [2000] [“Because this is a discrimination case where intent and state of mind are in dispute, summary judgment is ordinarily inappropriate”]). A jury might be less inclined to view plaintiff as a single “outlier with a problem” than as one of a number of older employees with negative experiences; the jury might also consider whether the “natural occurrence” rationale advanced by defendant was pretextual (see Bennett, 92 AD3d at 43 n 13 [“If one explanation offered by a defendant is able to be construed by a jury as false and therefore evidence of consciousness of guilt, that same jury would be permitted to weigh that evidence when assessing the veracity of the other explanations the defendant has offered”]). Of course, a jury could ultimately conclude that defendant’s failure to offer any substantive reason for the other departures of the other older physicians was not sufficient to convince it, on any theory, that discrimination played any part in defendant’s decisions affecting plaintiff. But that, again, is something the jury should be allowed to determine.
The fact that other older employees were forced to leave is also relevant to the strength or weakness of the mixed-motive case. Even if defendant genuinely believed the negative things it said about plaintiff, a jury might conclude that one element of defendant’s motivation was plaintiffs age.
It is also necessary to point out that the record reflects other evidence that would allow a jury to infer that the reasons proffered by defendant were not a complete explanation for its treatment of plaintiff. Robert B. Conaty, defendant’s executive vice-president for operations, who reviewed annual compensation for department chairs, asserted that the “rank, longevity or professional accomplishments” of a department chair were not material to their compensation. Conaty averred that the chairman’s reputation and success, his ability “to attract quality faculty and mentor them,” along with his “ability to generate income for the Medical Center,” were factors in determining compensation.
Melman’s success as chairman of the urology department included the publication of hundreds of academic articles in prestigious medical journals, many of which were coauthored by the department’s resident physicians, bolstering the residents’ post-training professional pursuits; authoring 42 textbook chapters; expanding the department’s laboratory and research space; and teaching thousands of students and resident physicians. Foreman, defendant’s president and chief executive offi *140 cer, acknowledged that plaintiff brought more than $200 million into what Conaty described as defendant’s “very small” urology department. Whether these accomplishments belied what defendant described as the seriousness of plaintiffs shortcomings was a question of fact for the jury.[8]
Finally, it bears mentioning that the motion court improperly relied on the idea that the existence of “animus” is a necessary element of a discrimination claim (Melman v Montefiore Med. Ctr., 36 Misc 3d 1216[A], 2010 NY Slip Op 52453[U], *3). On the contrary, the law has long been clear that intentional discrimination simply involves intentionally treating one person less well than another because of protected class status; it does not require evidence of animus.[9]
Retaliation
In addition to his discrimination claim, plaintiff also brought a claim of retaliation. To establish a retaliation claim under the City HRL, a plaintiff must make out a prima facie case that: (1) *141 he participated in a protected activity known to the defendant; (2) the defendant took an employment action that disadvantaged the plaintiff; and (3) a causal connection exists between the protected activity and the adverse employment action (see Farrugia v North Shore Univ. Hosp., 13 Misc 3d 740, 752 [2006]).
Plaintiff testified both that his compensation was affected and that he was isolated and marginalized. In respect to the latter, the motion court simply ignored evidence in the record. Plaintiff testified, for example, that defendant’s new president refused to talk with or deal with him, and that, contrary to past practice, after plaintiff complained of discrimination, defendant no longer asked him to serve on search committees or other committees. Thus, contrary to the majority’s contention, the actions that form the basis of plaintiffs retaliation complaint are not merely a “continuation of] the policies . . . that had prompted him to complain in the first place.”
With respect to a defendant’s actions that allegedly isolate and marginalize the plaintiff, the City HRL is clear that
“the assessment [must] be made with a keen sense of workplace realities, of the fact that the ‘chilling effect’ of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct in light of those realities. Accordingly, the language of the City HRL does not permit any type of challenged conduct to be categorically rejected as nonactionable. On the contrary, no challenged conduct may be deemed non-retaliatory before a determination that a jury could not reasonably conclude from the evidence that such conduct was, in the words of the statute, ‘reasonably likely to deter a person from engaging in protected activity’ ” (Williams v New York City Hous. Auth., 61 AD3d 62, 71 [2009], supra [footnote omitted]).
It would not be difficult for a jury to believe that a person would be less likely to complain of discrimination if he knew in advance that doing so would result in isolation or marginalization such as plaintiff described. For the chair of a department of a medical center, not being able to participate in committees is a significant element of the terms and conditions of employment. Moreover, the message sent to the chair’s colleagues by the chair’s enforced nonparticipation is profoundly negative and could easily be found to be the type of retaliatory behavior that *142 could deter a person from engaging in protected activity (compare Albunio, 16 NY3d at 476 [being “shunned and excluded from meetings” by a supervisor constituted an adverse employment action] [emphasis added]). The same would be true if the effect of complaining about discrimination was that the employee had less access to the hospital president than he had before.[10] This Court has found that such erosions of authority (e.g., exclusion from committees), when they follow the exercise of rights by a plaintiff with a good employment record are causally connected (see Albunio u City of New York, 67 AD3d 407, 408 [2009], affd 16 NY3d 472 [2011]). I would find, similarly, in this case a causal connection between plaintiffs complaint that defendant discriminated against him and defendant’s subsequent isolation or marginalization of him.
In short, plaintiffs allegations of isolation and marginalization are neither “amorphous” nor benign. And they should not be regarded as an inevitable or acceptable consequence of complaining of discrimination. Defendants are free to be unhappy about being sued, but one of the core purposes of anti-retaliation law is to prevent that unhappiness from infecting the way an employee is treated. An employee who has complained of discrimination must be afforded the same full participation in the business affairs of the defendant that is afforded to an equally situated employee who has not complained about discrimination. This is especially true under the City HRL, which proscribes retaliation “in any manner” (Administrative Code § 8-107 [7]). It is of no consequence that the harm suffered by the plaintiff may not have been significant, as the “ ‘degree of harm suffered by the individual “goes to the issue of damages, not liability” ’ ” (Farrugia, 13 Misc 3d at 752 n 4, quoting Craig Gurian, A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law, 33 Fordham Urb LJ 255, 320 [2006], quoting 2 EEOC Compliance *143 Manual § 8, at 8-13 [1998]). Plaintiff has presented evidence of isolation and marginalization that a jury should be allowed to assess. While his case may not be factually compelling, it is no less so than Albunio’s case.[11] In short, the majority here should not regard a “closer case” as an invitation to deny the plaintiff his day in court (see Albunio v City of New York, 16 NY3d 472 [2011] , supra).
Finally, it is incumbent upon the members of this panel to give “full effect” to this Court’s and the Court of Appeals’ precedents (see Ortega v City of New York, 95 AD3d 125, 129 n [2012] , citing Matter of Midland Ins. Co., 71 AD3d 221 [2010]). By ruling as a matter of law for defendant in this case, I believe that the majority is unjustifiably raising the evidentiary requirements to bring a claim for retaliation under the City HRL higher that this Court and the Court of Appeals have found necessary.
DeGrasse and Richter, JJ., concur with Friedman, J.P.; Acosta, J., dissents in a separate opinion.
Order, Supreme Court, Bronx County, entered May 28, 2010, affirmed, without costs.

. One of those routes — mixed motive — describes a circumstance of “partial” discrimination, which is proscribed under the City HRL since, “[u]nder Administrative Code § 8-101, discrimination shall play no role in decisions relating to employment, housing or public accommodations” (id. at 40, quoting Williams v New York City Hous. Auth., 61 AD3d 62, 78 n 27 [2009], lv denied 13 NY3d 702 [2009]; cf. Rep of Governmental Affairs Div, Comm on Gen Welfare, Prop. Int. No. 22-A, Aug. 17, 2005, reprinted in 2005 NY City Legis Ann, at 537; Weiss v JPMorgan Chase & Co., 2010 WL 114248, *1, 2010 US Dist LEXIS 2505, *2 [SD NY 2010] [the City HRL “requires only that a plaintiff prove that age was ‘a motivating factor’ for an adverse employment action”]).
The approach this Court set forth in Bennett is consistent with the Court of Appeals’ recognition that “we must construe Administrative Code § 8-107 (7), like other provisions of the City’s Human Rights Law, broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible” (Albunio v City of New York, 16 NY3d 472, 477-478 [2011] [emphasis added]). Construing the “because of” language of Administrative Code § 8-107 (1) (a) to mean that the discrimination was “a motivating factor,” even if not the sole motivating factor, is very clearly “reasonably possible” (compare Albunio at 477-479 [broadly construing the phrase “opposed any practice forbidden under this chapter” (Administrative Code § 8-107 [7]) in the City HRL to include implicit disapproved of discrimination]).

. This is also true of federal law (see e.g. Wanamaker v Columbian Rope Co., 108 F3d 462, 466 [2d Cir 1997] [“We recognize that, as in retaliation cases brought under Title VII, the ADEA does not define adverse employment action solely in terms of job termination or reduced wages and benefits, and that less flagrant reprisals by employers may indeed be adverse”] [emphasis added]). The Restoration Act recognizes federal and state civil rights provisions as “a floor below which the City’s Human Rights law cannot fall” (Local Law No. 85 § 1; see Loeffler v Staten Is. Univ. Hosp., 582 F3d 268, 278 [2009]).

. See Bennett, 92 AD3d at 35 n 1, citing Williams, 61 AD3d at 67.

. This is particularly so in the context of a large institution where there may be checks (i.e., a board of overseers) on an employer’s powers.

. Given the concession made by defendant’s representative in the course of his deposition, I am at a loss as to how the statements made by plaintiff concerning the various physicians who were terminated involuntarily constitute hearsay. In any event, to the extent those statements are indeed hearsay, they are admissible to defeat a motion for summary judgment since other evidence has been offered to support plaintiff’s claim of discrimination (see Schwaller v Squire Sanders & Dempsey, 249 AD2d 195, 197 [1998]).

. The majority contends that the grant of summary judgment dismissing cases against defendant in Saenger v Montefiore Med. Ctr. (706 F Supp 2d 494 [2010]) and Trieger v Montefiore Med. Ctr. (3 Misc 3d 1103[A], 2004 NY Slip Op 50350[U] [2004], affd 15 AD3d 175 [2005], lv denied 4 NY3d 710 [2005]) constitutes an “exoneration” of defendant, as if implying that the “exoneration” of defendant in those suits should guide our reasoning in this case. It is entirely possible that defendant was indeed “not guilty” of the accusations made against it in Saenger and Trieger. That is, of course, immaterial since (1) this suit concerns an entirely different plaintiff, and we do not judge a party’s “innocence” on the basis of whether it has previously been “exonerated” or “convicted,” and (2) the outcome of Saenger and Trieger does not *138 overcome the inference that we must draw against defendant for failing to establish the propriety of its actions vis-a-vis the numerous senior physicians whom it let go. To be sure, the bases for “exoneration” in those suits are unrelated to the pertinent issues in this case. The plaintiff in Trieger was fired for insubordination after he publicized a scathing memo attacking the administration (2004 NY Slip Op 50350[U], *4), while the plaintiff in Saenger was fired after physically assaulting a staff person and being accused of sexual harassment by several women (706 F Supp 2d at 497). In any event, I would note that Saenger and Trieger were decided under an entirely different standard from the one that this Court must apply in this case.

. The majority quotes Forrest stating that “the plaintiff must prove that the legitimate reasons proffered by the defendant were merely a pretext for discrimination by demonstrating both that the stated reasons were false and that discrimination was the real reason” (3 NY3d at 305). As previously indicated, the analysis in that case was rejected by the City Council when it enacted the Restoration Act. In the first case in which this Court analyzed the burden on a plaintiff opposing summary judgment under the City HRL following the Restoration Act, we construed the City HRL as permitting plaintiffs to go before a jury if there was “some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete” (Bennett, 92 AD3d at 43 [emphasis added]). Here, the majority inexplicably disregards that aspect of the Bennett standard, which other panels of this Court have embraced (see e.g. Sandiford v City of New York Dept. of Educ., 94 AD3d 593, 595 [2012]).

. Conaty’s denial that he thought that a January 4, 2007 letter from plaintiff to Foreman was a complaint of age discrimination could have been viewed by a jury as disingenuous, and therefore could have allowed a jury to be doubtful of Conaty’s proffered explanation for defendant’s conduct. The letter says explicitly that plaintiff was then in a position to “reasonably conclude that my age has played a role in your unwarranted discrimination.”

. For example, in United States v Wagner (940 F Supp 972, 980 [ND Tex 1996]), the court stated that the plaintiffs were not required to show that the defendants had any dislike of or animosity towards the disabled plaintiff because of her disability, only that the fact of the disability was a motivating factor in the defendants’ actions and decisions. A party who intentionally treats someone differently because of disability is not protected from liability by virtue of a sincere belief in stereotypes relating to the needs and abilities of persons with disabilities. “Whether motivated by animus, paternalism, or economic considerations, intentional handicap discrimination is prohibited by the Act” (id. [internal quotation marks omitted]; see also Village of Bellwood v Dwivedi, 895 F2d 1521, 1530-1531 [7th Cir 1990] [treating potential housing customers differently because of their race, even for nonracist reasons, is unlawful]; Williams v Matthews Co., 499 F2d 819, 827 [8th Cir 1974], cert denied 419 US 1022 [1974] [subjective good intentions do not overcome intentional discrimination in housing]; United States v Pelzer Realty Co., Inc., 484 F2d 438, 443 [5th Cir 1973], cert denied, 416 US 936 [1974] [unnecessary to find that “racial prejudice dominated (defendant’s) mind during the negotiations”]; Pederson v Louisiana State Univ., 213 F3d 858, 880 [5th Cir 2000] [“If an institution makes a decision not to provide equal athletic opportunities for its female students because of paternalism and stereotypical assumptions about their interests and abilities, that institution intended to treat women differently because of their sex”]; Emmel v Coca-Cola Bottling Co. of Chicago, 95 F3d 627, 634 [7th Cir 1996] [“paternalistic reason” for denying promotion, such as belief that job is “too confrontational or unpleasant for a woman” will not “withstand scrutiny” under Title VII]).

. The majority notes that plaintiff did not dispute defendant’s representation that he failed to attend all the meetings that Dr. Steven Safyer has held since he succeeded Foreman as president. The fact that plaintiff has not attended those meetings is, at best, evidence that there have been fewer opportunities for plaintiff and defendant to meet. It does not prove that defendant is not avoiding plaintiff.
The majority’s attempt to infer defendant’s mental state (i.e., intent) on the basis of plaintiffs action (or failure to act) is an inappropriate invasion of the jury’s province. Here, only a jury can make the credibility determination whether Safyer, who was deposed in this case, has been dismissive of plaintiff. Defendant’s characterization of Safyer’s intent is inappropriate, especially in light of plaintiffs evidence of Safyer’s animus against him.

. Notably, in Albunio, this Court and the Court of Appeals upheld a jury verdict in favor of a plaintiff (Albunio) who took no explicit action — unlike plaintiff in this case — to earn the animosity of her employer (16 NY3d at 479).